IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHN L. LOMAX,

                    Plaintiff,                         OPINION & ORDER

   v.

                                               13-cv-331-jdp

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.

---

      Plaintiff John Lomax seeks judicial review of a final decision of the Acting Commissioner of Social Security finding him not disabled within the meaning of the Social Security Act. Plaintiff contends, principally, that remand is warranted because the Administrative Law Judge (ALJ) did not fully account for plaintiff's mental and physical limitations in determining his residual functional capacity. Plaintiff also asserts that the Appeals Council erred in denying his request for review. The court finds plaintiff's arguments unpersuasive and will therefore affirm the Commissioner's decision.

BACKGROUND

**A.  Procedural Background**

      At the time of his application for Social Security benefits, plaintiff was 49 years old. He completed two years of college and served in the United States Marine Corps in 1980 and again from 1984 to 1986. Plaintiff held jobs in technical support and customer service, with his most recent employment as an audio-visual specialist lasting for a month in 2008. On June 28, 2011, plaintiff applied for supplemental security income, but his application was denied because his monthly income exceeded the maximum possible amount that the Social Security

Administration could pay. R. 74-83.[1] On June 29, 2011, plaintiff applied for disability insurance benefits. In his application, plaintiff alleged a disability onset date of August 30, 2008, and identified a number of mental and physical conditions that limited his ability to work: posttraumatic stress disorder (PTSD); depression; chronic pain; foot, back, neck, shoulder, and knee injuries; fibromyalgia; and gout. R. 172.

Plaintiff's application for disability insurance benefits was denied initially and again on reconsideration. After a hearing, ALJ Robert G. White issued a written opinion denying plaintiff's claim in full. The ALJ determined that plaintiff's date last insured was March 31, 2009, and concluded that plaintiff had not established a disability before this date. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final determination of the Commissioner. On May 10, 2013, plaintiff filed a timely petition for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B. Relevant Medical Evidence**

The ALJ determined that plaintiff had the following severe impairments: degenerative changes of the cervical spine, lumbar spine, and bilateral knees; obesity; PTSD; and depression. R. 17. The ALJ found that plaintiff's remaining alleged conditions "did not cause more than minimal work related limitations [and] the record contains no evidence of medical care, treatment, complaints of symptoms, or even diagnoses of such conditions during the relevant period." *Id.*

There is limited medical evidence of plaintiff's physical conditions. In his application for benefits, plaintiff stated that, in 2006, he visited the VA Hospital in Denver, Colorado, to receive treatment for his feet, knees, and back. R. 177. Plaintiff also indicated that since 2004,

---

[1] Record citations are to the Administrative Record, Dkt. 11.

he has been receiving treatment for these conditions at the VA Clinic in Baraboo, Wisconsin, and at the VA Hospital in Madison, Wisconsin. R. 176. Plaintiff walks with a cane, as well as a rolling walker, wears braces on his legs, and uses a "grabber" device to help him avoid bending. R. 44-46, 322. Since 2011, plaintiff has participated in a weekly tai chi class for pain management. R. 676.

The medical records plaintiff submitted with his application include treatment notes from two visits to the Madison VA Hospital between plaintiff's onset date and date last insured. R. 450-63. The first was on December 3, 2008, when plaintiff had a routine physical. He informed Teresa Wolkowski, a nurse practitioner, that he suffered from knee, foot, and back pain, but that he did not want pain medication. R. 460. Plaintiff also reported that there had been no recent problems with his gout. *Id.* Wolkowski discussed plaintiff's obesity with him and urged plaintiff to participate in a weight loss program; plaintiff refused. R. 460-61. Plaintiff's second visit was for a blood-draw and lab work.

Plaintiff underwent two physical residual functional capacity assessments from state agency physicians as part of his application for Social Security benefits. Syd Foster, DO, conducted the first assessment in August 2011. Dr. Foster noted that plaintiff alleged severe pain and that he had tender points and walked slowly, with a slight limp. R. 322. Dr. Foster also wrote that plaintiff had full strength and sensation throughout his body, full range of motion in his extremities, and only mildly decreased range of motion in his lumbar spine. *Id.* The x-rays Dr. Foster reviewed showed that plaintiff had chondromalacia[2] in both of his knees, mild degenerative joint disease in his left knee, and mild degenerative disc disease in his lumbar and

---

[2] Chondromalacia is a condition that involves damage to the cartilage under the kneecap. The most common symptom is knee pain that increases when a person walks up or down stairs. *Chondromalacia patella Definition*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/chondromalacia-patella/basics/definition/con-20025960 (last visited Aug. 14, 2014).

cervical spine. *Id.* Despite plaintiff's subjective complaints, Dr. Foster's notes confirm that plaintiff refused pain medication and said that he could "handle the pain." R. 322. Dr. Foster assigned the following exertional limitations for plaintiff: (1) occasionally lift 10 pounds; (2) frequently lift less than 10 pounds; (3) stand or walk for a total of 2 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour workday; and (5) unlimited ability to push or pull, except as limited by plaintiff's lifting restrictions. R. 316. Dr. Foster did not assign any postural, manipulative, visual, communicative, or environmental limitations. R. 317-19. The assessment concluded that plaintiff was capable of performing sedentary work. R. 322.

Pat Chan, MD, conducted plaintiff's second assessment in January 2012. Dr. Chan noted plaintiff's complaints of pain and back, neck, shoulder, and knee injuries, but reported that plaintiff did not want any medication for the pain. R. 479. Dr. Chan observed that plaintiff had no spinal tenderness, but that he walked with a mild limp. R. 480. According to Dr. Chan, plaintiff's x-rays showed mild degenerative changes in plaintiff's knees. *Id.* Dr. Chan assigned the following exertional limitations for plaintiff: (1) occasionally lift 20 pounds; (2) frequently lift 10 pounds; (3) stand or walk for a total of about 6 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour workday; and (5) unlimited ability to push or pull, except as limited by plaintiff's lifting restrictions. R. 479. Dr. Chan did not assign any postural, manipulative, visual, communicative, or environmental limitations. R. 480-82. The assessment concluded that plaintiff was capable of performing light work as of his date last insured. R. 480.

The record is somewhat fuller with regard to plaintiff's mental health conditions. The physician's certification that plaintiff's treating physician, Dean D. Krahn, MD, provided to accompany the application indicated that plaintiff suffers from major depression and PTSD. R. 189. In his application, plaintiff reported difficulty working with others because he is quick to get angry and wants to retaliate against people who cause him stress. R. 180. Plaintiff described

4

having homicidal and suicidal thoughts as a result of the stress his managers or supervisors placed on him and cited these feelings as the reasons he left or was fired from each job he has held. R. 179.

In September 2010, plaintiff underwent an "initial evaluation for post-traumatic stress disorder" at the Madison VA Hospital. R. 361. William Schmitt, PhD, interviewed plaintiff and prepared a written evaluation after reviewing plaintiff's medical records and "C-file"—the VA file of plaintiff's past claims and medical history. *Id.* Dr. Schmitt's report indicated that plaintiff began seeking an evaluation for PTSD in February 2010. *Id.* During the interview, plaintiff stated that he began experiencing symptoms and panic attacks about twenty years ago, with seven episodes since then. *Id.* Plaintiff recounted traumatic events from his time as a marine, most of which related to watching people die and "looking through a scope when someone's head explodes." *Id.* He described feeling fidgety and disconnected from other people, as well as having trouble sleeping. *Id.* Plaintiff also explained that he gets angry quickly and has difficulty "deal[ing] with people." R. 362. He reported having "a thousand stressor events, sniper hits, hand to hand combat, close kills," and falling off a truck while in the service. *Id.*

Dr. Schmitt reviewed plaintiff's military history, emphasizing that plaintiff was a peacetime veteran who served stateside and was never stationed in a war zone. *Id.* Dr. Schmitt concluded that the only stressor supported by plaintiff's records was the incident where plaintiff fell from a truck in September 1985. *Id.* Plaintiff reported that he was knocked out for thirty seconds and, afterward, his fellow servicemen teased him about the incident. Dr. Schmitt determined that the event amounted to "a low level of traumatic stress exposure." *Id.* Plaintiff described suffering intense fear during the incident and having recurring, intense memories of it, and Dr. Schmitt opined that plaintiff therefore suffered from "PTSD, chronic, moderate severity . . . severe enough to have caused the current psychiatric symptoms." R. 364. Since Dr.

5

Schmitt's diagnosis, plaintiff has participated in counseling and group therapy, and he regularly attends wellness and relaxation classes through the VA. R. 676.

As he did for his physical limitations, plaintiff underwent two mental residual functional capacity assessments, both with state agency physicians. Beth Jennings, PhD, completed the first assessment in August 2011. In her assessment, Dr. Jennings reported that plaintiff claimed "he was in the special ops teams and was a sniper who witnessed killings and was tortured." R. 339. But Dr. Jennings noted that plaintiff's "service record does not support this. He was only stationed stateside. There is no indication that he witnessed violence or was tortured." *Id.* Dr. Jennings wrote that plaintiff gets angered easily and often thinks others are incompetent, and she indicated that plaintiff has trouble getting along with authority figures and with following directions. *Id.* Dr. Jennings concluded that plaintiff had a depressive disorder, not otherwise specified; PTSD and an anxiety disorder, not otherwise specified; and alcohol abuse in full remission. R. 326-31. She assigned moderate limitations in plaintiff's daily living, social functioning, and ability to maintain concentration, persistence, and pace. R. 333. Specifically, Dr. Jennings concluded that plaintiff was moderately limited in his ability to: (1) understand and remember detailed instructions; (2) maintain attention and concentration for extended periods; (3) maintain regular attendance and be punctual; (4) work in coordination with others; (5) work without interruptions; (6) interact with the public; (7) accept instructions and criticism from supervisors; (8) get along with coworkers; and (9) respond to changes in the work setting. R. 337-38. Dr. Jennings opined that, despite plaintiff's limitations with regard to social functioning, he had the capacity to perform unskilled work. R. 339.

Roger Rattan, PhD, performed plaintiff's second mental residual functional capacity assessment in January 2012. He concluded that plaintiff had no determinable mental impairment as of his date last insured. R. 476. Dr. Rattan found insufficient evidence to

determine whether plaintiff had a depressive disorder, PTSD, or an anxiety disorder, R. 467, 469, and found insufficient evidence to impose any limitations on plaintiff's abilities, R. 474. In the narrative section of his assessment, Dr. Rattan reported that plaintiff "did not have an evaluation for PTSD until 9/2010, well after [the date last insured]. He had not taken any medication for depression or anxiety as of [the date last insured] based on the available medical records." R. 476.

## C.  The Administrative Hearing and Decision

The ALJ held a hearing on October 31, 2012. Plaintiff was present, with counsel, as well as Leslie H. Goldsmith, PhD, an impartial vocational expert (VE). R. 43. Plaintiff's medical records were accepted into evidence without objection and the ALJ heard testimony from plaintiff and the VE. R. 42, 44.

The ALJ began by asking plaintiff about his walker and leg braces, as well as his past employment. The ALJ also asked plaintiff to confirm the reasons why he felt he could not work. Plaintiff answered that his feet, knees, back, and PTSD were the primary reasons. R. 49. The ALJ remarked that plaintiff had refused medication and medical treatment for some of his conditions and that the record did not indicate that plaintiff needed a leg brace or rolling walker during the relevant time period. R. 49-50. When plaintiff testified that he suffered from liver and kidney disease, the ALJ remarked at not seeing anything about either condition in plaintiff's medical records. R. 51. Plaintiff's attorney interjected and explained that there "really aren't . . . records from back in that time period." *Id.* Toward the end of his testimony, plaintiff began to describe the tai chi exercises he did to help manage his pain. Plaintiff testified that he spent about fifteen minutes a day doing his exercises, but explained that he did not "push anything" and only did the routines to the extent he was physically able. R. 64.

7

When plaintiff began to testify about his PTSD, the ALJ tried to confirm that the triggering event was plaintiff's fall from a truck. Plaintiff explained that he had been a special ops sniper, and when the ALJ confronted him with the fact that his records do not suggest he was ever in a war zone, plaintiff responded that it "was all top secret, above top secret. So they're not going to have that record." R. 56. Plaintiff went on to testify about his difficulty sleeping and overall irritability. He recounted one event in New Mexico when he walked into a Wal-Mart and had a physical altercation with another customer. According to plaintiff, the customer called him names and so plaintiff grabbed the customer, threw him up against a wall, and struck him repeatedly. R. 58. The ALJ somewhat skeptically asked plaintiff to confirm that he had been able to overcome someone about his own size and weight despite his alleged pain and the fact that he had been using a rolling walker. R. 59. Plaintiff responded that his anger issues enabled him to "overcome[] all of that." *Id.*

The VE testified that plaintiff could not perform any past relevant work, but that there were jobs available at the sedentary, unskilled level. R. 68-69. The ALJ then posed a series of hypothetical questions to the VE, asking him to assume a person limited to unskilled, sedentary work, with no public contact and who could be off-task five percent of the time. R. 68. The VE testified that there would be jobs in the state of Wisconsin available to such a person. *Id.* When the ALJ added a further limitation of being off-task twenty percent of the time, the VE responded that there would not be any jobs available. R. 69. The ALJ then asked about being absent from work, and the VE confirmed that there would be jobs available to a person who could be absent one day or less each month, but none available to a person who needed more than a day or who had routine outbursts in the workplace. R. 69-70.

The ALJ issued a written decision on November 13, 2012, concluding that plaintiff was not disabled through his date last insured. The ALJ first discussed plaintiff's mental

impairments, observing that "prior to the date last insured, there is no evidence of a mental health diagnosis nor is there any evidence that the claimant sought out mental health care or treatment nor did he report any mental health symptoms to his treating doctors." R. 18. Attempting to give plaintiff "some additional benefit of the doubt," however, the ALJ found that plaintiff's PTSD and depressive disorder were severe impairments. *Id.* Nevertheless, the ALJ determined that there was a lack of information about plaintiff's functional capabilities during the relevant period. The ALJ gave "weight" to Dr. Jennings's assessment, but "little weight" to the limitations she suggested; "some weight" to Dr. Rattan's assessment; and "little weight" to Dr. Krahn's opinion, concluding that he did not have a treating or other relationship with plaintiff during the relevant time period. R. 20.

The ALJ next discussed plaintiff's physical limitations, beginning by observing that "there is little record of any medical care or treatment pertaining to [plaintiff's physical] conditions." R. 21. The ALJ focused on treatment notes from plaintiff's December 2008 physical, highlighting that plaintiff's examination was "largely unremarkable and [plaintiff] voiced no interest in participating in treatment for his alleged pain." R. 22. The ALJ gave "great weight" to the opinions of the state agency consultants, finding their conclusions most consistent with and supported by the objective medical evidence during the relevant period. R. 23. The ALJ again gave "little weight" to Dr. Krahn's opinion because the doctor did not have a treating relationship with the plaintiff during the relevant time period. *Id.* Finally, the ALJ noted that "no treating or examining source attested to any specific work related physical limitations during the relevant period nor did any doctor allege that [plaintiff] was unable to work because of his conditions." *Id.*

The ALJ also reviewed plaintiff's credibility. He ultimately found plaintiff to be less than credible, citing inconsistencies between plaintiff's testimony and his daily activities,

inconsistencies between plaintiff's subjective complains and the objective evidence, and specific instances where plaintiff's testimony was particularly difficult to believe—that he served in a war zone and that he had the strength to overcome a customer at Wal-Mart. R. 22. After reviewing plaintiff's limitations and credibility, the ALJ concluded that plaintiff had the residual functional capacity to perform sedentary, unskilled work, provided that he have no contact with the public and be off-task five percent of the workday. R. 21. As there were jobs within these limits available to plaintiff during the relevant time period, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act.

## OPINION

When a federal court reviews a final decision by the Commissioner of Social Security, the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Even so, a district court may not simply "rubber-stamp" the Commissioner's decision. *See Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). Rather, "the court must conduct a critical review of the evidence before affirming the [C]ommissioner's decision, and the decision cannot stand if it lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1079 (W.D. Wis. 2008) (internal citations omitted). To provide the necessary support for a decision to deny

benefits, the ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

In this case, plaintiff contends that the ALJ's residual functional capacity finding is deficient because the ALJ did not fully account for plaintiff's mental and physical limitations. Plaintiff also argues that the Appeals Council erred in denying review of the ALJ's decision. After reviewing the record in this case, the court concludes that the ALJ's decision is supported by substantial evidence and that the Appeals Council properly denied review. The court will therefore affirm the Commissioner's decision.

**A. The ALJ supported his residual functional capacity finding with substantial evidence.**

Plaintiff identifies three deficiencies in the ALJ's residual functional capacity finding and suggests that these deficiencies leave the ALJ's decision without substantial evidence. First, plaintiff argues that the ALJ omitted some of the mental limitations in Dr. Jennings's opinion without adequate explanation. Dkt. 17, at 7. Specifically, plaintiff directs the court to the portion of Dr. Jennings's assessment which indicates that plaintiff is "moderately limited" in his ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 338. Second, plaintiff argues that the ALJ failed to build a "logical bridge" between the evidence in the record and the ALJ's conclusion that plaintiff would need to be off-task at least five percent of the workday. Dkt. 17, at 9. Finally, plaintiff contends that the ALJ, by incorrectly finding plaintiff do be less than credible, did not account for all of his physical limitations in the residual functional capacity finding. *Id.* at 10. Plaintiff asserts that any one of these deficiencies would be enough for the court to remand his case to the Commissioner. Plaintiff's arguments are not persuasive.

11

1.  **The ALJ adequately discussed Dr. Jennings's opinion and properly rejected some of her proposed limitations.**

With regard to Dr. Jennings's assessment, plaintiff argues that because the ALJ chose to assign weight to the opinion, he was obligated to adopt *all* of the doctor's limitations, not just some. Plaintiff correctly points out that "[a]n ALJ may not selectively consider medical reports . . . . It is not enough for the ALJ to address mere portions of a doctor's report." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (internal citations omitted); *see also Campbell v. Astrue*, 627 F.3d 299, 306-07 (7th Cir. 2010) ("The ALJ failed to evaluate the entirety of the mental health assessment . . . . The ALJ focused her attention on [one] section . . . instead of considering the six-page report as a whole."). In this case, plaintiff specifically contends that the ALJ omitted any reference to Dr. Jennings's limitations on plaintiff's ability to interact with co-workers and supervisors. Dkt. 17, at 8. However, plaintiff's argument fails because the ALJ's decision, in fact, considers and rejects these limitations.

There is conflicting evidence in the record regarding plaintiff's ability to interact with others. Statements that plaintiff made in his application and during his testimony certainly support the conclusion that he would have difficulty working with others or receiving instructions and criticism from supervisors. For example, when asked if he has "any problems getting along with family, friends, neighbors, or others," plaintiff responded: "I highly dislike just about everyone!" R. 185. When asked how well he gets along with authority figures, plaintiff wrote: "Screw them! I wouldn't piss on them if they were on fire! Nazis!" R. 186. Dr. Jennings relied on similar statements in recommending that plaintiff not interact with supervisors or co-workers. R. 339. But there is contrary evidence in the record as well. Plaintiff regularly attends church and is able to move about freely in the community to shop and attend

medical appointments. R. 19. During his most recent employment, there is no evidence that plaintiff struggled with his co-workers or supervisors. In fact, plaintiff testified that the reason he was fired from his last job was for not being able to complete tasks and because his employer thought it looked bad to have an employee walking around the casino floor with a cane. R. 48-49. Moreover, Dr. Jennings's own report noted that plaintiff is able to socialize with his housemates and that despite thinking about harming others, plaintiff says he has no plans to follow through on those thoughts. R. 339. Dr. Jennings found plaintiff's statements to be only "partially credible, he appears to have normal mood/affect in exams." *Id.*

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Here, the ALJ's opinion confirms that he did not simply ignore Dr. Jennings's proposed supervisor and co-worker limitations. In rejecting these restrictions, the ALJ recounted evidence of plaintiff's ability to "move about freely in the community to attend medical appointments and church as well as shop." R. 19. The ALJ also discussed how plaintiff has no difficulty interacting with his medical providers and emphasized that plaintiff left his last job because of his physical limitations, not his mental health symptoms. *Id.* After gathering this evidence, the ALJ concluded that "[t]here is no indication that [plaintiff] had difficulty getting along with others or that he was unable to maintain satisfactory pace and performance." *Id.*[3]

Plaintiff directs the court to *Young v. Barnhart*, 362 F.3d 995 (7th Cir. 2004), but the case does not support his position. In *Young*, the court reversed an ALJ when the residual

---

[3] This discussion occurred before the ALJ explained what weight he gave to Dr. Jennings's opinion. This fact is immaterial, however, because when the ALJ discussed the opinion directly, he noted that "Dr. Jennings also reported a number of moderate limitations in specific work related activities. The undersigned has given these opinions little weight as they are not supported by the overall evidence." R. 20.

13

functional capacity assessment did not recognize and discuss a medical report which recommended limited contact with supervisors. 362 F.3d at 1002. The court held that the ALJ had "not sufficiently connected the dots between [the claimant's] impairments, supported by substantial evidence in the record, and the RFC finding." *Id.* In this case, however, the ALJ provided sufficient explanation for rejecting certain parts of Dr. Jennings's opinion. As the *Young* court recommended, the ALJ *has* highlighted conflicting evidence in the record and Dr. Jennings's own credibility determination as reasons for rejecting any limits on plaintiff's ability to interact with supervisors and co-workers. On review, this court does not re-weigh evidence or consider whether the ALJ's decision was right or wrong, *Clifford*, 227 F.3d at 869, but analyzes whether there is substantial evidence to support the decision. Here, the ALJ identified and weighed the relevant evidence and then adequately explained why he felt some of Dr. Jennings's limitations were not necessary. The court will not disrupt this determination.

### 2. The ALJ built a "logical bridge" between the record and his conclusion that plaintiff would need to be off-task at least five percent of the work day.

Plaintiff's second challenge to the ALJ's residual functional capacity assessment is that there is no bridge between the evidence and the ALJ's conclusion that plaintiff would be off-task at least five percent of the work day. This argument fails for largely the same reasons that plaintiff's first challenge does. When making residual functional capacity determinations, SSR 96-8p requires ALJs to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The Seventh Circuit has highlighted the importance of this requirement, holding that an ALJ must explain how he or she reaches a particular conclusion on a claimant's limitations. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("The ALJ needed

to explain how she reached her conclusions about Scott's physical capabilities."); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir. 2010) ("An ALJ must explain why he does not credit evidence [of limitations] that would support strongly a claim of disability, or why he concludes that such evidence is outweighed by other evidence.").

In this case, plaintiff observes that the ALJ's decision does not explain why *five* percent is the appropriate limit (as opposed to 10%, 20%, 50%, etc.). But plaintiff does not identify medical evidence that the ALJ failed to consider in choosing this limit. Tellingly, plaintiff's brief does not actually argue that the five percent off-task finding is too low—although this is presumably why plaintiff raises the issue. Instead, plaintiff simply asserts that "[t]he ALJ does not cite to anything in the record which supports the specific finding that Plaintiff would be off-task no more than 5% of the workday on a regular basis." Dkt. 17, at 10. According to plaintiff, two medical opinions in the record prevent such a finding, at least in the absence of a more thorough explanation by the ALJ. First, there are the treatment notes from plaintiff's September 8, 2010, visit to Dr. Schmitt. R. 237-42. Toward the end of his report, Dr. Schmitt wrote that "there is occasional decrease in work efficiency or there are intermittent periods of inability to perform occupational tasks due to signs and symptoms, but generally satisfactory functioning." R. 242. Dr. Schmitt concluded that plaintiff's "PTSD would pose moderate vocational limitations." *Id.* Next, plaintiff directs the court to a report in which Dr. Jennings opined that plaintiff required moderate limitations in maintaining concentration, persistence, or pace. R. 333. Specifically, Dr. Jennings concluded that plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to work with others without becoming distracted, and to complete work without interruptions and maintain a consistent pace. R. 337-38.

15

Neither of these medical opinions compelled the ALJ to find that plaintiff would have to be off-task more than five percent of the day and the ALJ adequately explained why he felt neither was persuasive in determining plaintiff's limitations. First, as a practical matter, plaintiff does not explain how these statements contradict the ALJ's limitation. While it is the ALJ's job to support the findings he makes, the court sees nothing obviously incorrect about using the opinions plaintiff identifies to reach a conclusion that he would need to be off-task five percent of the time. Even if this evidence could support a higher percentage, however, the ALJ adequately explained why he found each opinion unpersuasive. With regard to Dr. Schmitt's report, the ALJ acknowledged the doctor's statements about plaintiff's ability to work, but found that "such conclusions were formed after the date last insured and are therefore outside of the relevant period." R. 20. In the very next paragraph of his opinion, the ALJ expressed his concern that "no treating or examining source attested to any specific work related mental limitations *during the relevant period* nor did any doctor allege that that [plaintiff] was unable to work because of his psychological conditions." R. 21 (emphasis added). Because plaintiff had to offer evidence of what his limitations were *before* his date last insured, the ALJ was correctly hesitant to give too much weight to Dr. Schmitt's opinion. *See Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period.").

With regard to Dr. Jennings's opinion, the ALJ acknowledged her recommendations, but gave them "little weight" because they lacked the support of the overall evidence. R. 20. The ALJ largely relied on the same evidence he used to discredit Dr. Jennings's proposed limitations on plaintiff's interactions with supervisors and co-workers. The court has already explained how this discussion provided adequate grounds for excluding Dr. Jennings's limitations from plaintiff's residual functional capacity assessment.

16

The court agrees with plaintiff that the ALJ's explanation for selecting a five percent off-task restriction lacks a lengthy, detailed discussion of why that percentage is superior to others. The court cannot agree, however, that the explanation which the ALJ provided falls short of SSR 96-8p's requirements. The ALJ recognized and discussed the exact medical evidence plaintiff now presents. In so doing, the ALJ provided a "narrative discussion describing how the evidence supports each conclusion." SSR 96-8p. The cases plaintiff cites in support of his position do not compel a contrary conclusion. For example, plaintiff correctly summarizes *Scott* as reversing an ALJ who did not give reasons for imposing a lifting limitation. 647 F.3d at 740. But in that case, the Seventh Circuit found dispositive the fact that "the primary piece of evidence that [the ALJ] relied on does not support the propositions for which it is cited." *Id.* The court went on to explain that Scott, through her hearing testimony, had presented direct evidence of her limited ability to lift more than a gallon of milk. *Id.* at 740-41. In this case, however, plaintiff did not present evidence of how much time he would need to be off-task during the day and none of the medical opinions in the record call for a specific amount.

By including the five percent off-task limitation in plaintiff's residual functional capacity assessment, the ALJ gave plaintiff the benefit of an additional limitation not explicitly required by the medical evidence. Other courts have been willing to relax the rules requiring ALJs to support such "beneficial" limitations and it is reasonable to do so in this case as well. *See Wennersten v. Colvin*, No. 12-cv-783, 2013 WL 4821474, at *3 (W.D. Wis. Sept. 10, 2013) ("Plaintiff says that the administrative law judge could have found that plaintiff would be off task 15%, 25% or 50% of the time . . . . The problem with this argument is that he cites no evidence to support a conclusion that any of his impairments would cause him to be off task more than five percent of the time. That failure alone is a sufficient ground to affirm the decision."); *Merritt v. Astrue*, 872 F. Supp. 2d 742, 755-56 (N.D. Ill. 2012) (affirming an ALJ

whose residual functional capacity assessment "grant[ed] more off-task and off-work time than was supported by the evidence of record."). The ALJ gave plaintiff an additional limitation not required by any evidence in the record and plaintiff identifies nothing that would enable him to challenge the limitation for not being as great as he would have liked. Moreover, the ALJ's reasoning on this point was sufficient to establish a "logical bridge" from the evidence to his conclusion and is not grounds for remand.

### 3. The ALJ properly evaluated and determined plaintiff's credibility.

Plaintiff's final challenge is that the ALJ's deficient credibility determination led to a residual functional capacity assessment which did not fully account for plaintiff's physical limitations. In crafting a residual functional capacity, an ALJ can rely on a claimant's statements about the intensity, persistence, and functionally limiting effects of his or her symptoms. 20 C.F.R. § 404.1529. To use a claimant's statements, an ALJ must necessarily make a credibility determination and SSR 96-7p requires ALJs to "consider the entire case record and give specific reasons for the weight given to the individual's statements." The court ordinarily affords credibility determinations considerable deference and upholds them if the ALJ gives "specific reasons for the finding that are supported by substantial evidence." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

The ALJ gave two principal reasons for discounting plaintiff's reports of his physical symptoms. First, the ALJ highlighted the fact that plaintiff only sought treatment once during the relevant time period. The ALJ recounted that the examination "was largely unremarkable and the claimant voiced no interest in participating in treatment for his alleged pain." R. 22. Standing alone, the fact that plaintiff did not pursue treatment would not be dispositive because "the ALJ must not draw any inferences about a claimant's condition from this failure unless the

ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (internal citations and quotation marks omitted). But here, the record confirms that in 2008, plaintiff told his doctors that he did not want pain medication or to participate in a weight loss program. R. 460-61. At the hearing, plaintiff implied that he did not want pain medication because he suffered from liver and kidney damage, R. 50-51, but the ALJ responded, correctly, that the medical record does not contain diagnosis of or treatment for either condition. From this evidence, it was reasonable for the ALJ to use plaintiff's decision to forgo treatment to discredit his subjective reports about the severity of his pain. *See Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007) (a claimant's "medical history indicates that she voluntarily discontinued physical therapy and declined to pursue pain management, both of which cast doubt on the severity of [the claimant's] pain and her need to alleviate it").

Second, the ALJ focused on obvious and significant inconsistencies within plaintiff's testimony as reasons for finding his statements less deserving of weight. First, plaintiff testified that he had worn a leg brace since 1990 or 1992, R. 47, but the ALJ noted that "[e]xaminations of the claimant have not support[ed] this statement." R. 22. Second, the ALJ summarized plaintiff's testimony about the physical altercation at Wal-Mart and ultimately found it "implausible when considered that the claimant also alleged the need to use a rolling walker [and] in spite of this public display of severe violence, the police were never called." *Id.* Finally, the ALJ reviewed plaintiff's allegations of witnessing combat violence and being subjected to torture in the military, but noted that "his allegations were determined to be unfounded as he was only in the military during peace time and [never] deployed for any combat service." *Id.* The ALJ concluded by explaining that "[t]he lack of truth associated with these allegations, as well as the inconsistencies between the claimant's subjective complaints and the overall objective evidence limit his overall credibility." *Id.*

19

Plaintiff largely overlooks his decision not to seek treatment and the inconsistencies in his statements. Instead, plaintiff contends that the ALJ relied on his daily activities as evidence that contradicted his subjective reports of disabling pain, but did not explore the qualifications plaintiff places on his daily activities. This approach fails because it misreads the ALJ's decision. Plaintiff alleged a disability due to mental and physical conditions. The ALJ discussed plaintiff's daily activities—performing household chores, attending church and medical appointments, and shopping—in the context of plaintiff's *mental* limitations, not his physical limitations. R. 18-19. The ALJ noted that plaintiff's behavior undercut the assertion that he was limited in his ability to interact with others. Although the ALJ referred to this discussion later when addressing plaintiff's overall credibility, the ALJ chose to focus on the lack of treatment and the obvious inconsistencies in plaintiff's testimony as reasons for disbelieving his subjective complaints about his *physical* conditions. Plaintiff does not identify challenges to the ALJ's credibility determination as it related to plaintiff's physical limitations and there is nothing else to suggest that the ALJ's residual functional capacity assessment was deficient.

## B. The Appeals Council properly denied review of the ALJ's decision.

Plaintiff's final challenge to the Commissioner's decision is that the Appeals Council denied him review despite the fact that plaintiff identified new and material medical evidence that was not before the ALJ. Plaintiff's additional evidence is a letter from the VA, which he received after the ALJ issued a decision but before the Appeals Council denied review. R. 748. The letter informs plaintiff that the VA increased the percent to which his PTSD was disabling, from 30% to 70%, as of November 9, 2010. R. 749. The letter also explains that the VA decided to grant plaintiff a 100% compensation rate because he was "unable to work due to [his] service

connected disability/disabilities." *Id.* Plaintiff submitted this letter to the Appeals Council while his request for review was pending. R. 747.

When deciding whether to grant review, the Appeals Council considers "new and material evidence . . . only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). This court analyzes whether the Appeals Council made an error of law in refusing review, but "[i]n the absence of any such error . . . the Council's decision whether to review is discretionary and unreviewable." *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997). According to the Seventh Circuit, a common example of legal error is "a determination that the evidence submitted for the first time to the Appeals Council was not 'new' or 'material' within the meaning of the governing rules." *Id.* Standing alone, however, legal error does not require remand. Indeed, the court will still affirm the Commissioner's decision if the Appeals Council's error was harmless. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("[A]dministrative error may be harmless."); *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) ("[I]n administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision."); *cf. Farrell v. Astrue*, 692 F.3d 767, 772 (7th Cir. 2012) (remanding only after finding legal error in the Appeals Council's decision and then determining that the "error was not harmless"). Here, plaintiff contends that the Appeals Council erred in "finding the additional evidence submitted by Plaintiff to be not material." Dkt. 17, at 16. The Commissioner disagrees, but argues that even if the Appeals Council committed error, it was harmless.

The Appeals Council did not explain whether it determined that plaintiff's evidence was "new and material." The Commissioner directs the court to a section of the Social Security Administration's internal Hearings, Appeals, and Litigation Law Manual (HALLEX), which

discusses how the Appeals Council considers additional evidence. In this case, the Appeals Council's denial tracks the requirements of HALLEX I-3-5-20, Section B, applicable to new and material evidence. The Commissioner urges the court to therefore conclude that the Appeals Council determined that plaintiff's evidence was new and material—which would mean there was no legal error and the Appeal's Council's decision is non-reviewable. Had the Appeals Council determined that plaintiff's evidence was *not* new and material, it would have followed HALLEX I-3-5-20, Section A, in drafting its denial order. Whatever the merit of this argument, the Seventh Circuit has held that when boilerplate language appears in a decision to deny review, courts should "interpret the Appeals Council decision as stating that it has rejected [a plaintiff's] new evidence as non-qualifying." *Farrell*, 692 F.3d at 771. In this case, the Appeals Council stated that it considered plaintiff's additional evidence, but concluded that the "information [did] not provide a basis for changing the Administrative Law Judge's decision." R. 4. Under *Farrell*, the court treats this language as a decision that plaintiff's evidence was not "new and material," and reviews that decision for error.

Neither plaintiff nor the Commissioner articulates a standard for "materiality" in the context of Appeals Council review, although the Commissioner states that it is a "low standard." Dkt. 24, at 16.[4] HALLEX I-3-3-6 explains that new and material evidence is:

> 1. Not part of the claim(s) record as of the date of the ALJ decision;
> 2. Relevant, i.e., involves or is directly related to issues adjudicated by the ALJ; and
> 3. Relates to the period on or before the date of the ALJ decision, meaning it is: (1) dated before or on the date of the ALJ decision, or (2) post-dates the ALJ decision but is reasonably related to the time period adjudicated by the ALJ.

---

[4] Plaintiff slightly misquotes HALLEX I-3-3-6 for a standard of material evidence, saying "[i]t is material when it affects the ALJ's findings or conclusions and relates to the time period . . . on or before the date of the ALJ's decision" Dkt. 17, at 15 (omission in original). Only the language about evidence relating to the correct time period actually appears in HALLEX I-3-3-6.

This standard appears to be different from, and lower than what plaintiff would have to show if he were seeking remand from this court under sentence six of § 405(g). *Perkins*, 107 F.3d at 1296 ("For sentence six purposes (as opposed to Appeals Council review, for example), 'materiality' means that there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered."). In this case, the Commissioner correctly concedes that the VA's letter "satisfies the new and material standard for Appeals Council review." Dkt. 24, at 6. Under HALLEX's definition, the VA's letter regarding plaintiff's PTSD easily "involves or is directly related to" the issues which were before the ALJ. Given the relevance of the VA's letter, and the Commissioner's concession, the court concludes that the Appeals Council erred in determining that plaintiff's evidence was not new and material.

Finding legal error does not end the court's analysis. Even if the Appeals Council had correctly determined that the VA letter constituted new and material evidence, § 404.970(b) only permits the council to review an ALJ's decision if "it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." Here, even with the addition of the VA's letter, plaintiff cannot demonstrate that the Appeals Council would conclude that the ALJ's decision is contrary to the evidence of record. Plaintiff contends that the ALJ "found that Plaintiff's mental conditions were not adequately evidenced in the medical records during the relevant period" and that the VA's letter fills this gap. Dkt. 17, at 15. Specifically, he argues that the letter demonstrates "that Plaintiff suffered from PTSD as a result of his Marine service time . . . further, the previous evidence also reflects [that plaintiff] suffered from these symptoms, which lead to job loss, throughout the relevant time period." *Id.* The VA's letter does not accomplish as much as plaintiff suggests.

23

The ALJ already gave plaintiff the benefit of the doubt and concluded that he suffered from PTSD during the relevant time period; the ALJ assigned a residual functional capacity to account for this disability. R. 18-23. Plaintiff has therefore already received the benefit of the PTSD diagnosis confirmed in the letter and the VA's new determination does not add anything to undermine the ALJ's analysis. *See Barker v. Colvin*, No. 12-cv-29, 2013 WL 4481287, at *14 (N.D. Ind. Aug. 19, 2013) ("It is not evident how this additional evidence was material. Although these new observations and surgery support [plaintiff's] complaints of pain, the ALJ already had accommodated [plaintiff's] knee pain by restricting him to a sedentary position."). Plaintiff does not explain what additional limitations the VA's letter would support and this omission would make it difficult for the Appeals Council to determine that that ALJ's decision is contrary to the evidence of record.

More fundamentally, the letter does not provide what the ALJ found lacking: evidence of specific mental or physical limitations on plaintiff's ability to work. Throughout his opinion, the ALJ repeated his concern that "no treating or examining source attested to any specific work related mental [or physical] limitations during the relevant period nor did any doctor allege that he was unable to work because of his psychological conditions." R. 21, 23. The letter, by itself, does not solve this problem. Although the Seventh Circuit requires the Social Security Administration to afford "some weight" to VA disability determinations, *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006), plaintiff correctly concedes that the mere finding of disability is not binding. Dkt. 17, at 16; *see also Davel v. Sullivan*, 902 F.2d 559, 560 n.1 (7th Cir. 1990) ("The VA's decision is, of course, not binding on the Social Security Administration . . . . The VA's decision is entitled to some weight, and should be considered . . . but the Secretary is by no means required to acquiesce in the VA's conclusion.") (internal citations omitted). The VA's reasoning for its finding and the medical evidence that supported it might have shifted the

24

overall weight of the record and left the ALJ's conclusion inapposite, but plaintiff did not submit any of this evidence to the Appeals Council.[5] Instead, he chose to offer only the VA's letter with its conclusory finding of disability. R. 748-54. Without the supporting material, the letter does little to alter the evidence of record.

Finally, plaintiff offers the court nothing to suggest that the VA's determination was based on different evidence than that which the ALJ considered in reaching his conclusion. Most of the medical evidence in plaintiff's application for Social Security benefits came from VA hospitals and clinics. As the court has already discussed, the ALJ properly analyzed this evidence and adequately explained the conclusions he drew from it. To demonstrate that the VA's letter makes the ALJ's conclusion contrary to the record, plaintiff must do more than rely on the mere fact that a different agency came to a different conclusion on similar evidence. *See Hall v. Astrue*, 218 F. App'x 499, 502 (7th Cir. 2007) ("The examination's conclusion that he cannot work regularly primarily relies on the very testimony the ALJ discredited during [plaintiff's] administrative hearing, and the report's conclusions based on his psychological test results are consistent with the medical evidence the ALJ considered. Furthermore, the Commission is not bound by a disability determination made by another agency such as the VA."). Because of the minimal effect that the VA's letter has on the overall record, the Appeals Council could not have concluded that the ALJ's decision was contrary to the weight of the evidence. Any error in classifying the letter was therefore harmless and not a basis for remand.

---

[5] Plaintiff presumably had this information because the VA's letter states: "We have enclosed a copy of your Decision Review Officer Decision for your review. It provides a *detailed explanation of our decision, the evidence considered, and the reasons for our decision.*" R. 750 (emphasis added).

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security, is AFFIRMED and plaintiff John Lomax's appeal is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 28th day of August, 2014.

BY THE COURT:
/s/
JAMES D. PETERSON
District Judge